**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| BRIAN A. MASTRO, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 03-1865 (RMC) |
| PEPCO, *et al.*, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Brian A. Mastro, a Caucasian, worked at the Potomac Electric Power Company ("Pepco") from October 2, 1989 to May 20, 2002, when he was discharged for a "major incident of lack of candor" and a "major incident of unsatisfactory job performance." Mr. Mastro sues Pepco, arguing that Pepco's pre-discharge investigation was flawed and its termination decision the result of reverse race discrimination. He also sues for defamation based on the alleged improper publication of information regarding his termination.

Mr. Mastro offers only argument, not evidence, that Pepco's decision to terminate his employment was tainted by discriminatory animus. Similarly, he offers no evidence to support his argument that any of the defendants improperly published information regarding his termination. The Court will grant the motion for summary judgment filed by Pepco and the individually-named defendants and dismiss the complaint.

1

## BACKGROUND

After more than twelve years of employment, Mr. Mastro was terminated by Pepco on May 20, 2002. Pepco dismissed him because Mr. Mastro's supervisors concluded that he had not told the truth about a subordinate's absence from work.

Mr. Mastro holds bachelor's degrees in psychology and electrical engineering, and a master's degree in engineering. Second Amend. Compl. ¶ 9. From 1989 to 1996, he worked as a system engineer for Pepco. In 1996, Mr. Mastro was promoted to Distribution Project Engineer in the Underground Lines Section. *Id.* ¶ 10. In 2001, he became Distribution Project Engineer for Underground High Voltage, a position he held immediately prior to his termination. *Id.*

During his tenure, Mr. Mastro supervised work crews and managed numerous large construction and electrical projects. *Id.* at 11. Mr. Mastro received favorable employment reviews and his supervisors had no previous reason to doubt his honesty or integrity. Sigafoose Dep. at 8; Pancholi Dep. at 24-25.

On Sunday, February 17, 2002, one of Mr. Mastro's subordinates, Donald Harsley, was arrested after threatening to burn down a restaurant. Harsley Dep. at 27-30, 52, 56. Mr. Harsley is an African-American who, at the time, was a probationary employee and had worked for the company for less than a year. Because he was jailed after his arrest, Mr. Harsley was absent from work during the subsequent week. Pancholi Dep. at 70-72.

The exact timing of when Mr. Harsley informed Mr. Mastro of the reason for his absence is a disputed fact that was central to Pepco's decision to terminate Mr. Mastro. Mr. Harsley insists that he left a message with Mr. Mastro on Monday, February 18, informing him that he needed two days of vacation because he was in jail. He also states that he spoke with Mr. Mastro

on the evenings of Tuesday, February 19, and Wednesday, February 20, and told him that he was still in jail and needed more vacation time. Harsley Dep. at 27-28, 47-50. Mr. Mastro agrees that he spoke with Mr. Harsley on Tuesday, Mastro Dep. at 34-35, but argues that he did not know that Mr. Harsley was in jail until Wednesday evening or Thursday. Instead, Mr. Mastro claims that "[b]ased on rumors that Mr. Harsley was in jail," he consulted with a Pepco official about company policy in such situations, *id*. at 29-30, and informed Mr. Sunil Pancholi, his direct supervisor, on Thursday morning that Mr. Harsley was in jail. *Id*. at 35-36. Mr. Pancholi reported what he had learned to a Pepco compliance investigator, David Duarte. Pancholi Dep. at 69-70; Duarte Dep. at 11.[1] Mr. Duarte is African-American and Mr. Pancholi is East Indian. Pltf.'s Opp. at 2.

Based on information obtained from Mr. Mastro, Pepco planned to fire Mr. Harsley for lying to his supervisor about the fact that he was in jail when he asked for vacation time off. Pancholi Dep. at 88, 90. During an April 11 meeting attended by management and union representatives, Mr. Harsley insisted that a message had been left with Mr. Mastro on Monday, February 18, informing him that Mr. Harsley was in jail. Harsley Dep. at 27-28, 47-50; Pancholi. James Bryant, the employee who actually recorded vacation schedules, was called into the meeting. Bryant Dep. at 6, 16, 20-21. Mr. Bryant is an African-American. Pltf.'s Opp. at 2. Mr. Bryant reported that Mr. Mastro instructed him to mark Mr. Harsley as being on vacation on the morning of Tuesday, February 19, because Mr. Harsley was in jail. Bryant Dep. at 10-13, 21-22. Mr. Bryant was able to recall the day this happened because he was off work the next day for his annual

---

[1] Mr. Duarte is a Senior Investigation and Mediation Specialist in Pepco's Compliance and Regulatory Reporting Division. Second Amend. Compl. ¶ 5. He describes himself as a Labor Relations Specialist for one area of Pepco, including those employees under Mr. Pancholi. Duarte Dep. at 34.

checkup. Bryant Dep. at 14-15. Pepco decided not to discharge Mr. Harsley but extended his probationary period for eighteen months. Pancholi Dep. at 91-92.

Thereafter, Messrs. Pancholi and Duarte questioned Mr. Mastro further about the events of that week. Mr. Mastro continued to maintain that he did not learn that Mr. Harsley was actually in jail until Thursday, February 21, and that Mr. Harsley had a pre-scheduled vacation day on Tuesday, February 19. Pancholi Dep. at 112-19; Duarte Dep. at 31-34. Mr. Mastro provided a written summary of the events as he recalled them. Pancholi Dep. at 124-22; *id.* Exh. D0238 (written submission from Mr. Mastro) ("Communication on Tuesday and Wednesday, did not state that Mr. Harsley was in Jail. He said he was arrested for domestic problems. Witnesses misheard my comments about arrest and assumed he was in jail or possibly knew this already from another source.").

After internal consultations, Pepco managers concluded that Mr. Mastro had not been candid. On May 10, 2002, Mr. Pancholi issued a memorandum to Mr. Mastro:

> stating that Plaintiff knew of a Pepco probationary employee's incarceration on February 19, 2002, and the employee's request for vacation that day. The memorandum further stated that Plaintiff approved daily vacation requests from February 19-22, 2002, knowing that the employee was incarcerated, and falsely advised management that he became aware of the employee's incarceration on February 21, 2002. The memorandum further stated that Plaintiff also advised management that the employee had been pre-approved for vacation for February 19, 2002. According to the memorandum, when Plaintiff was directed by management to provide written documentation of his involvement, he continued to deny that he knew of the employee's incarceration on February 19, 2002. The memorandum concluded that Plaintiff's actions "include serious/major incidents of lack of candor and a serious/major incident of unsatisfactory performance," that Plaintiff would be placed on crisis suspension, and that discharge appeared warranted.

Second Amend. Compl. ¶ 25; *see* Pancholi Dep. Exh. 7.[2]

A meeting to discuss Mr. Mastro's continued employment with Pepco was convened on May 14. Second Amend. Compl. ¶ 29.[3] Mr. Mastro was steadfast, asserting that Mr. Harsley had not informed him that Mr. Harsley was in jail until Thursday, February 21. Duarte Dep. at 76. The department calendar, where Mr. Mastro said he had written a pre-scheduled vacation day for Mr. Harsley for Tuesday, February 19, and various time sheets were reviewed. The calendar showed that Mr. Harsley was off for the week; Rudy Bradshaw was off on February 19 and 20; and Mr. Bryant was off on February 20. However, Mr. Harsley's time sheet was coded for unscheduled vacation on February 19. Duarte Aff. at ¶ 6. At the end of the meeting, Messrs. Pancholi, Duarte, and Wisniewski agreed that Mr. Mastro should be terminated unless further investigation suggested that Mr. Mastro had indeed been telling the truth. Pancholi Dep. at 165-66.

Thereafter, Mr. Duarte re-interviewed Mr. Harsley on May 18. Mr. Harsley was also steadfast, asserting that he had informed Mr. Mastro that he was in jail on the evening of February 18. Mr. Duarte interviewed Jose Smith, a fellow employee and friend of Mr. Harsley. Mr. Smith reported that Mr. Mastro had asked Mr. Smith on February 19 if he knew how to contact Mr. Harsley's girlfriend because Mr. Mastro had received a message on his answering service from Mr. Harsley stating that he was in jail. Duarte Dep. at 12-13, 45-46. Further, Mr. Mastro reportedly told

---

[2] "[C]risis suspension means that this is an investigation being conducted and the employee involved would not be required to come to work and he will not be paid for that time either." Pancholi Dep. at 157.

[3] Attendees at this meeting included: Brian Mastro, the plaintiff; Sunil Pancholi, his first line supervisor; David Duarte, a Labor Relations Specialist from Compliance & Regulatory Reporting; and Stan Wisniewski, Mr. Pancholi's supervisor from Field Services. *See* Pancholi Dep. Exh. 8.

Mr. Smith that he had put Mr. Harsley on vacation. *Id.*[4] Mr. Pancholi spoke with an employee, Dexter Herbert, who stated that Mr. Mastro had asked him for the phone number of Mr. Harsley's girlfriend on Tuesday, February 19, and that Mr. Mastro had indicated that he wanted to find out more about Mr. Harsley's arrest. Pancholi Dep. at 159; Pancholi Aff. ¶ 11. Both Mr. Pancholi and Mr. Duarte confirmed with Mr. Bryant that Mr. Harsley had not had pre-scheduled vacation on February 19 and that he recalled a conversation with Mr. Mastro concerning Mr. Harsley's incarceration. Pancholi Dep. at 128, 163; Bryant Dep. at 24-25.[5]

As a result of this investigation, Pepco managers concluded that they believed Messrs. Harsley, Bryant, and Smith, not Mr. Mastro. Duarte Aff. ¶ 10. They concluded that Mr. Mastro had not told them the truth. Pancholi Dep. at 139-40, 142; Duarte Dep. at 48. Mr. Pancholi sent a letter to Mr. Mastro on May 20, 2002, informing him that:

> Our previous investigations and subsequent additional investigations/interviews confirm that your actions indeed constituted a serious/major lack of candor and serious/major incident of unsatisfactory performance.
>
> Based on the facts and consistent with Corporate policy, we have terminated your employment, effective this date.

Pancholi Dep. Exh. 8.

Mr. Mastro initiated this litigation in the Superior Court of the District of Columbia on May 9, 2003. His initial complaint contained three counts of defamation. Count three, based on

---

[4] Mr. Duarte contacted Nelson Daniels, a leadman under Mr. Mastro, but Mr. Daniels had no useful information. Duarte Aff. at ¶ 7.

[5] Mr. Pancholi also contacted Michael Pepper, Supervisor of Distribution for whom Mr. Harsley had previously worked, to see if Mr. Harsley was a "troubled employee" as asserted by Mr. Mastro. Pancholi Dep. at 160; Pancholi Aff. ¶¶ 12, 14. Oliver Butler, General Supervisor of Distribution, confirmed that Mr. Harsley had no history of work problems. *Id.*

communications from Pepco to the D.C. Department of Employment Services, was dismissed by the Superior Court on July 25, 2003. Counts one and two were based upon an alleged improper publication of the May 10, 2002 memorandum from Mr. Pancholi to Mr. Mastro and the May 20, 2002 termination letter.

The initial complaint in this Court was filed on September 5, 2003, alleging reverse discrimination in violation of Title VII of the Civil Rights Act of 1964. The parties agreed to consolidate the two actions and, on February 18, 2004, this Court granted Mr. Mastro's consent motion to amend the complaint in Federal Court to add the claims from Superior Court.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This procedural device is not a disfavored legal shortcut; rather, it is a reasoned and careful way to resolve cases fairly and expeditiously. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case. *Anderson*, 477 U.S. at 247-48; *Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

The moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A nonmoving party must

establish more than "the existence of a scintilla of evidence" in support of his position, *Anderson*, 477 U.S. at 255, and may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## REVERSE DISCRIMINATION

Mr. Mastro brings a claim of race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Title VII is designed to eliminate employment discrimination by prohibiting dissimilar treatment of similarly-situated employees on the basis of race, color, religion, sex, or national origin. *McDonald v. Santa Fe Trail Transp. Co.* 427 U.S. 273, 278-79 (1976). "This is true regardless of whether the discrimination is directed against majorities or minorities." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71-72 (1977).

In typical employment discrimination cases under Title VII -- involving minority plaintiffs -- courts generally apply the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff must first establish by a preponderance of the evidence a *prima faci*e case of discrimination.

> To establish a prima facie case of discriminatory discharge, plaintiff ordinarily must show that (1) she belongs to a protected class, (2) that she performed at or near the level legitimately expected by her employer, (3) that she was discharged, and (4) that she was replaced by a person outside the protected class or that similarly situated individuals outside the protected class were retained.

*Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 5 (D.D.C. 2000) (citing *Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12, 17 (D.D.C. 1999)). If successful, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its conduct. "If the employer

meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993).

Some adjustment to this "basic allocation of burdens and order of presentation of proof" is needed "in the *prima facie* case required of a white male." *Lanphear v. Prokop*, 703 F.2d 1311, 1314-15 (D.C. Cir. 1983). Although membership in a socially-disfavored group was a predicate assumption in *McDonnell Douglas*, the Supreme Court recognized that the framework of analysis must be flexible to the requirements of the particular case and the particular offense alleged. *McDonnell Douglas,* 411 U.S. at 802 n.13. In all cases, the plaintiff's initial burden is to prove by a preponderance of the evidence that the circumstances of a dismissal "give rise to an inference of discrimination." *Harding v. Gray*, 9 F.3d 150, 152 (D.C. Cir. 1993) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Where the plaintiff is a white man, no such inference arises automatically through satisfaction of the typical *prima facie* case. Therefore, to establish a *prima facie* case, a white plaintiff must "show additional 'background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id*. at 153 (quoting *Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)). This showing of background circumstances "substitutes for the minority plaintiff's burden to show that he is a member of a racial minority . . . ." *Id*. (citing *Bishopp v. District of Columbia*, 788 F.2d 781, 786 (D.C. Cir. 1986)).

Defendants appear to concede that Mr. Mastro can establish the first and third elements of his *prima facie* case because "he is a member of a protected class and was

terminated . . . ." Defs.' Mem. at 5. They argue nonetheless that summary judgment must be granted in Defendants' favor because Mr. Mastro cannot establish the second and fourth elements of his *prima facie* case. *Id.* Specifically, Defendants argue that Mr. Mastro cannot establish that he was performing at or near Pepco's legitimate expectations because he lied about his knowledge about Mr. Harsley's incarceration. In addition, Defendants propose that Mr. Mastro has not presented evidence that he was replaced by a person outside his protected class, that similarly-situated individuals outside his protected class were retained, or that there are other circumstances that give rise to an inference of discrimination. *Id.* The Court agrees that Mr. Mastro cannot establish a *prima facie* case of discrimination.[6]

As an initial matter, the Court perceives that the Defendants have treated the principle of *Harding* that a non-minority plaintiff must show an inference of discrimination against non-minorities as part of the fourth prong of the *prima facie* case, rather than as a substitute for the

---

[6] The Court disagrees with Defendants that Mr. Mastro was not performing up to expectations. Mr. Mastro claims that he had an "unblemished record of sterling performance, including near perfect attendance." Pltf.'s Opp. at 13. Although Defendants argue that this statement is inaccurate, they present little contradictory argument or evidence. Instead, they state that "[w]hat is relevant is Pepco's perception of Plaintiff's job performance at the time of Plaintiff's discharge, not his historical performance." Defs.' Reply at 3. Defendants assert that Mr. Mastro was not meeting Pepco's expectations because at the time he was terminated Pepco believed that Mr. Mastro had lied to his supervisor and that this showed a serious lack of candor and constituted an incident of unsatisfactory performance. *Id.*

Defendants' reliance upon Pepco's belief as to Mr. Mastro's candor cannot be the lynchpin for arguing that his performance was unsound because it is the very event that Mr. Mastro claims is tainted by discrimination. In the absence of record evidence to the contrary, Mr. Mastro's contention that he was meeting Pepco's employment expectations must be credited. Pltf.'s Opp. at 13 (citing to Pancholi Dep. at 14-21). *See Laboy v.* O'Neill, 180 F. Supp. 2d 18, 23 (D.D.C. 2001) (citing *Greene v. Dalton*, 164 F.3d 671, 674 (D.C. Cir. 1999)) (nonmoving party may not rely solely on allegations or conclusory statements but must come forward with specific facts).

10

minority plaintiff's burden to show that he is part of a racial minority -- the first prong of the *prima facie* case. *See* Defs.' Mem. at 5-6 ("With respect to the fourth element . . . Plaintiff has not presented any additional background circumstances . . . ."). But for Defendants' concession as to the first prong, this rhetorical structuring would be of no consequence. Because the Court is not bound by this concession, it will examine whether Plaintiff has satisfied its burden under the first prong.

The D.C. Circuit in *Harding* provided a general overview of the type of evidence that could constitute "background circumstances." *Harding*, 9 F.3d at 151. A satisfactory showing could include evidence that a "particular employer at issue has some reason or inclination to discriminate invidiously against whites . . . or evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Id.* at 153 (also holding that evidence that there is something "fishy" may "create a *prima facie* case by itself."); *see Waterhouse*, 124 F. Supp. 2d at 5 n.5 (summarizing the *Harding* approach to reverse-discrimination cases).

Mr. Mastro claims in summary fashion that he has a "gut feeling" that his termination was prompted by discriminatory animus, but provides no evidence of this fact. Mastro Dep. at 232-35, 242-43, 249-50. This lack of factual underpinning is illustrated by the following excerpt from his deposition.

> Q. Mr. Pancholi and Mr. Duarte, having conducted an investigation, believed the people who told them that you knew about the Harsley incarceration as opposed to you, who said that you didn't, isn't that correct.
>
> A. Oh, I'd say that's correct.
>
> Q. Was there any reason that they chose to believe those five people over you?

  A. I don't know what the reasoning was.

Mastro Dep. at 65.

  Mr. Mastro asserts, "Defendants are a troubled company" citing a class action settlement reached in 1993 for alleged race discrimination against African-American employees. Pltf.'s Opp. at 1 n.1.  He notes further that two of his supervisors "who acted against [him] because of his race" did so to benefit "two of its African American employees, Donald Harsley and James Bryant." *Id.*  He points out that Mr. Duarte is African-American and that Mr. Pancholi is East Indian. *Id*. at 2.

  Such facts and unsupported allegations do not establish background circumstances that raise even a colorable suspicion that the employer is acting to discriminate against the majority. *Anderson*, 477 U.S. at 249-50 (if evidence is merely "colorable or not significantly probative, summary judgment may be granted").  Rather, Mr. Mastro's proffer admits only a finding that he was dismissed in a perfunctory manner for what appears to be an isolated incident of apparent misconduct.  His termination under such circumstances may indeed be baffling.  As Mr. Mastro notes, Defendants "can assign no plausible motive for Mr. Mastro to lie about knowing that one of his subordinates – with whom he had worked only a short time – was in jail." *Id.* at 3.  But to infer discrimination because " PEPCO's non-white supervisors decided to take the word of a short-term African American employee, Mr. Harsley, who had been absent for four days because he was <u>in jail</u> rather than the word of Brian Mastro, a long-time, respected, high performing white manager,"*id.* at 5, requires a leap of logic that is not supported by anything more than bare allegations.

  Mr. Mastro's *prima facie* case fails for yet another reason: he has not produced evidence that he was replaced by someone outside of his protected class or that similarly-situated

persons outside of his class were retained. He argues that he was initially replaced by an African-American. While true, this replacement was not permanent. Defs.' Mem. at 5. Furthermore, the position has been offered on a temporary basis to persons both white and non-white. No inference of discrimination can be drawn from these facts.

In addition, Mr. Mastro is unable to show that similarly-situated persons outside of his class were retained under the same types of circumstances that led to Mr. Mastro's termination. Mr. Mastro provides hearsay statements that other white supervisors were disciplined more harshly than African-Americans for similar kinds of infractions, all of which are contradicted by sworn testimony of Pepco witnesses. *See* Pltf.'s Opp. at 4. Mr. Mastro claims that a Caucasian employee was terminated for using a racial epithet, but that an African-American employee was not terminated for using the same epithet. *Id.* But there were other factors that contributed to the Caucasian employee's departure, a fact Mr. Mastro acknowledges. Mastro Dep. at 253-54. He argues that a Caucasian lead man was disciplined for refusing to work in the field while an African-American employee received a lesser sanction. Again, the disparate treatment between these two employees is attributable to factual differences and the severity of the misconduct by these employees.

To establish disparate treatment, a plaintiff must show that other persons who "are similarly-situated in all respects," were treated differently. *Phillips v. Holladay Property Servs., Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Mr. Mastro cannot point to any person who engaged in the same type of conduct that led to his termination but was treated differently. Consequently, he has failed to satisfy the fourth prong of his *prima facie* case.

Because "bare allegations of discrimination are insufficient to defeat a properly-

supported motion for summary judgment," Mr. Mastro has failed to make a probative showing that an inference of discrimination is warranted on these facts. *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002).

## DEFAMATION

Mr. Mastro alleges that he was defamed. A statement is defamatory if it tends to injure plaintiff in his trade, profession, or community standing, or lower him in the estimation of the community. *Moldea v. New York Times*, 15 F.3d 1137, 1142 (D.C. Cir. 1994). To prove a claim of defamation, a plaintiff must show:

> "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."

*Crowley v. North Am. Telecomm. Ass'n.*, 691 A.2d 1169, 1173 n.2 (D.C. 1997) (quoting *Prins v. Int'l Tel. and Tel. Corp.*, 757 F. Supp. 87, 90 (D.D.C. 1991)).

A common-interest privilege exists to publish an otherwise defamatory statement where the statement was "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest." *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990) (citing *Ingber v. Ross*, 479 A.2d 1256, 1264 n.8 (D.C. 1984); *Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C. 1979)). Excessive publication, or publication to those with no common interest in the information communicated, will render the statement non-privileged. *See, e.g., Joftes v. Kaufman*, 324 F. Supp. 660, 664 (D.D.C.

14

1971) (privilege "do[es] not exist where the employer publishes . . . the grounds for dismissal to persons without a legitimate job-related interest in receiving it").

Because Mr. Mastro has not produced any evidence that Defendants published the statement without privilege to a third party, his defamation claims must fail. Mr. Mastro argues that information regarding his termination, including the May 10, 2002 memorandum regarding his continued employment and the May 20, 2002 letter regarding his termination, was published improperly. But he has produced no evidence that anyone published such information to anyone other than plaintiff, plaintiff's management, Pepco's Employee Relations Department, and two administrative clerks. Mr. Mastro can only state that the circumstances of his termination "became . . . widely known at Pepco," Pltf.'s Opp. at 25, and list a number of persons who were aware that "he had been terminated because he had allegedly lied about an employee's [sic] being in jail." *Id.* at 26. He has not produced any evidence that these individuals received this information improperly.

Because the reason for his firing "spread like wildfire," Mr. Mastro asks this Court to infer improper publication. Pltf.'s Opp. at 28. Such unsupported inference is insufficient to defeat Defendants' properly-supported summary judgment motion. Summary judgment will be entered against Mr. Mastro on his defamation claims.

**CONCLUSION**

For the reasons stated, Defendants' motion for summary judgment is granted. This case will be dismissed. A separate Order accompanies this memorandum opinion.

DATE: February 25, 2005.                               /s/
                                                       ROSEMARY M. COLLYER
                                                       United States District Judge